# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Christopher Geraci, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING DEFENDANTS'** |
| vs. | ) | **DISPOSITIVE MOTIONS** |
| | ) | |
| Women's Alliance, Inc. d/b/a Domestic | ) | |
| Violence and Rape Crisis Center, and | ) | |
| Stark County, North Dakota, | ) | Case No. 1:03-cv-129 |
| | ) | |
| Defendants. | ) | |

Before the Court are several motions filed by defendants Women's Alliance, Inc. d/b/a Domestic Violence and Rape Crisis Center and Stark County, North Dakota.   On November 28, 2005, the defendant, Women's Alliance, Inc. d/b/a Domestic Violence and Rape Crisis Center, filed a Motion for Summary Judgment as to the Plaintiff's state and federal RICO claims.  See Docket No. 38.  On December 12, 2005, Women's Alliance filed a second Motion for Summary Judgment as to the Plaintiff's remaining claims of negligent infliction of emotional distress and intentional infliction of emotional distress.  See Docket No. 39.[1]  On December 15, 2005, the defendant, Stark County, North Dakota, filed a Motion for Summary Judgment as to all three of the Plaintiff's claims. See Docket No. 40.  The plaintiff, Christopher Geraci, has filed a response opposing each.  For the following reasons, the motions are granted.

---

[1]Both motions were originally filed as motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Exhibits were attached to each motion.  Having presented materials outside of the pleadings, the Court treated both motions as motions for summary judgment.  See Fed. R. Civ. P. 12(b)(6).  Both parties were then given time to file additional material.  See Docket No. 46.

## I.  **BACKGROUND**

The plaintiff, Christopher Geraci, and his ex-wife Heather Geraci were married in 1998. They lived in the state of New York and had two daughters.  See Amended Complaint, ¶ 3.  The couple was separated several times over the course of their relationship.  Christopher and Heather first separated in April of 1999 for a period of five months.  See Deposition of Christopher Geraci, p. 111.  The couple also separated for extended periods during the summer and fall of 2001.  The final separation occurred in April of 2002.[2]  See Deposition of Heather Geraci McCray, p. 9.  During each period of separation, the two children lived with Heather.  See Deposition of Christopher Geraci, p. 109.

In April 2002, Christopher and Heather were involved in legal proceedings in New York concerning the custody of the children and visitation rights.  See Amended Complaint, ¶ 3.  Heather was awarded physical custody of the children and they lived with her.  See Deposition of Heather Geraci McCray, p. 10.  Christopher was given supervised visitation.  See Deposition of Christopher Geraci, p. 118.  In August 2002, Christopher was given unsupervised visitation.  See Deposition of Heather Geraci McCray, p. 42.  The change in visitation prompted Heather to leave New York.  Id. at 10.  She did not tell Christopher.  Id.

After leaving New York, Heather traveled to the Domestic Violence and Rape Crisis Center ("Rape Crisis Center") in Dickinson, North Dakota.[3]  See Deposition of Heather Geraci McCray, p. 12.  Heather arrived at the Rape Crisis Center in February of 2003 using the name Marie

---

[2]Heather claims that the final separation was spurred by physical abuse on the part of Christopher.  See Deposition of Heather Geraci McCray, p. 9.  Christopher denies such allegations.  See Deposition of Christopher Geraci, p. 107.

[3]Heather made stops in Pennsylvania and Minnesota.  See Deposition of Heather Geraci McCray, p. 12.

Johnson.[4]  Id. at 14-15.  Heather told the Rape Crisis Center that she was trying to keep herself and her children away from a "violent situation," but did not provide details.  Id. at 65-66.

During her time away, Christopher continued to pursue custody and visitation.  On October 1, 2002, due in part to Heather's disappearance, Christopher was awarded custody of the two children.  See Deposition of Christopher Geraci, p. 126.  Heather was unaware that such an order had been entered.  See Deposition of Heather Geraci McCray, pp. 48-49.

On June 22, 2003, Eva Rohr, a social worker at Stark County Social Services, learned the true identity of Heather Geraci and learned that the Geraci children had been reported missing.  See Deposition of Eva Rohr, pp. 10-11.  This information came to her from Jacqueline Baker, a former resident at the Rape Crisis Center who had befriended Heather.[5]  Id; see Affidavit of Jackie Baker, pp. 1-3.  Eva Rohr reported the information to the Dickinson Police Department that same day.  See Deposition of Eva Rohr, p. 64.  The Dickinson Police Department then contacted the Cohoes City Police Department in New York and learned that the case was still open and the children were believed to be with the non-custodial parent, Heather Geraci.  See Deposition of William Leach, pp. 8-9; Leach Deposition Ex. 1, p. 2.  The Dickinson Police Department also learned of the court order awarding custody of the children to Christopher.  Id. at 9.  The New York authorities requested that the children be picked up and taken into custody.  See Leach Deposition Ex. 1, p. 2.

On June 24, 2003, officers from the Dickinson Police Department went to the Rape Crisis Center and took custody of the two children.  See Deposition of Heather Geraci McCray, p. 21.

---

[4]Heather contacted the Rape Crisis Center prior to her arrival to confirm that she could stay at the facility. See Deposition of Heather Geraci McCray, p. 12.

[5]Baker had moved out of the Rape Crisis Center prior to June 2003.  See Deposition of Heather Geraci McCray, p. 19.  Baker discovered that the children were missing via the Internet.  See Affidavit of Jackie Baker, pp. 6-7.

Christopher was notified the same day.  <u>See</u> Deposition of Christopher Geraci, p. 125.  The children were then placed in foster care.  <u>See</u> Deposition of Eva Rohr, p. 15.

After a hearing held on June 25, 2003, in the District Court of Stark County, in Dickinson, the court found there was probable cause to believe that the Geraci children were deprived and there were reasonable grounds to believe that it was necessary to enter a temporary shelter care order for their protection.  The court ordered that Stark County Social Services be granted custody of the Geraci children for a period of sixty (60) days.  If Stark County Social Services did not file a formal petition within thirty (30) days the children would be returned to the custody of their custodial parent, Christopher.  <u>See</u> Shelter Care Order, pp. 1-2.

While in the custody of Stark County Social Services, visitation for Christopher was arranged through Family Connection, a facility that provides supervised visitation for families where it may not be safe for the parents and the children to be alone without observation.  <u>See</u> Deposition of Eva Rohr, p. 19.  Visitation for Heather was arranged at the Rape Crisis Center.  <u>Id.</u>  The children's visits took place between the hours of 8:00 a.m. and 5:00 p.m.  Overnight visits were not permitted.  <u>See</u> Deposition of Carrie Kovash, pp. 39-40.  Extra staff members were always on site at the Rape Crisis Center when the Geraci children visited Heather.  <u>Id.</u> at 39.

Stark County Social Services decided not to pursue a formal petition to retain custody of the children beyond the sixty (60) day time period provided for in the shelter care order.  Stark County then began making arrangements to return custody of the children to Christopher.  <u>See</u> Deposition of Eva Rohr, p. 101.  Transfer of custody was scheduled for Friday, July 24, 2003, at 9:00 a.m.  <u>See</u> Deposition of Carrie Kovash, p. 22.  In light of the impending transfer, Eva Rohr increased security at the Rape Crisis Center to one-on-one supervision with Heather and the children; meaning a staff

4

person would be with Heather at all times during the children's visits.  Id; Deposition of Eva Rohr, p. 92.  Neither Christopher nor his lawyer at the time were opposed to such visitations.  See Deposition of Christopher Geraci, p. 114; Deposition of Eva Rohr, p. 101.

On July 24, 2003, Heather left the Rape Crisis Center with the two children.  See Deposition of Heather Geraci McCray, pp. 25-26.  To carry out her plan, Heather coerced a fellow resident at the Rape Crisis Center to create a diversion to occupy the supervising employee.  Id. at 52.  Heather then told the remaining Rape Crisis Center employee that she was going to go outside and pick flowers, a common activity for herself and the two children.  Id. at 52-53.  Instead, Heather and the children got into a waiting car and left the Rape Crisis Center.  Id. at 27.

Heather did not inform any Rape Crisis Center or Stark County employees of her decision to leave.  See Deposition of Heather Geraci McCray, pp. 28-29.  In fact, Heather told others that she intended to pursue legal action to regain custody of the children.  Id. at 29 and 33.  No employee of either the Rape Center Crisis Center or Stark County assisted Heather in formulating or carrying out her plan.  Id. at 28-29.  Heather never contacted any Rape Crisis Center or Stark County employees after she left the Center.  Id. at 31.

On December 13, 2003, Christopher Geraci filed an action against the Rape Crisis Center and Stark County in United States District Court for the District of North Dakota.[6]  The complaint alleges three causes of action: (1) negligent infliction of emotional distress; (2) intentional infliction of emotional distress; and (3) state and federal RICO claims.  See Amended Complaint, ¶¶ 5-8.

---

[6]The original defendants were Family Connection, Stark County Social Services Board, Stark County, North Dakota.  See Docket No. 1.  The complaint was amended on March 11, 2004, to reflect only the current defendants, Women's Alliance Inc., d/b/a Domestic Violence and Rape Crisis Center and Stark County North Dakota.  See Docket No. 18.  For purposes of this order, all references to the complaint will be to the amended complaint filed on March 11, 2004.

In January of 2005, Heather and the two children were located in the state of Utah.  The children were returned to Christopher, and Heather was extradited to North Dakota to face criminal charges.  Heather later pled guilty to the charge of custodial interference in state court.  See Deposition of Heather Geraci McCray, p. 101.

## II.    LEGAL DISCUSSION

Both Defendants have filed motions for summary judgment seeking dismissal of all three claims included in the complaint, namely negligent infliction of emotional distress, intentional infliction of emotional distress, and state and federal RICO claims.  Defendant Stark County has raised discretionary immunity as a defense to each.

### A.    STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999).  A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996).  The moving party has the initial burden of demonstrating to the Court that there are no genuine issues

of material fact.  If the moving party has met this burden, the non-moving party cannot simply rest

on the mere denials or allegations in the pleadings.  Instead, the non-moving party must set forth

specific facts showing that there are genuine issues for trial.  Fed.R.Civ.P. 56(e).  A mere trace of

evidence supporting the non-movant's position is insufficient.  Instead, the facts must generate

evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 252 (1986).


       **B.**      **DISCRETIONARY IMMUNITY**

It is well-established that a trial court should resolve immunity issues at the earliest possible

stage of litigation.  See Shape v. Barnes County, North Dakota, 396 F.Supp.2d 1067, 1074 (D. N.D.

2005) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  North Dakota has long since abandoned

the doctrine of governmental immunity.  See Kitto v. Minot Park Dist., 224 N.W.2d 795 (N.D.

1974).  In the wake of that decision, the North Dakota Legislature enacted Section 32-12.1 of the

North Dakota Century Code to limit the liability of political subdivisions.  See Ficek v. Martin, 685

N.W.2d 98, 107 (N.D. 2004).  While liability was limited, the Legislature did not disrupt the long-

standing doctrine of respondeat superior codified at Section 32-12.1-03(1) of the North Dakota

Century Code.  See Binstock v. Fort Yates School Dist. No. 4, 463 N.W.2d 837, 841 (N.D. 1990).

As a general rule, entities such as political subdivisions are liable for torts committed by their

employees acting within the scope of their employment.  See N.D. Cent. Code § 32-12.1-03(1).

Section 32-12.1-03(3)(d) of the North Dakota Century Code exempts political subdivisions[7]

from liability for an act or omission of its employees who are performing discretionary functions or

---

[7]The term "political subdivisions" includes counties.  See N.D. Cent. Code § 32-12.1-02(6)(a).

duties.[8]  To determine the applicability of the discretionary function exception, courts engage in a two-part inquiry: "(1) whether the conduct at issue is discretionary, involving an element of judgment or choice for the acting employee; and (2) if the act is discretionary, whether the judgment or choice is of the kind the discretionary function exception was designed to shield."  Kautzman v. McDonald, 621 N.W.2d 871, 879 (N.D. 2001) (citing Olson v. City of Garrison, 539 N.W.2d 663, 666-667 (N.D. 1995)).  The discretionary function exception applies only to actions in tort, and was not intended to preempt actions grounded in statute or the constitution.  See Shape v. Barnes County, North Dakota, 396 F.Supp.2d 1067, 1075 (D. N.D. 2005).  Thus, if applicable, the discretionary immunity exception would only apply to Geraci's tort claims, that being negligent infliction of emotional distress and intentional infliction of emotional distress.  Stark County would still face potential liability on Geraci's federal and state RICO claims.

It is well-established that conduct cannot be discretionary unless it involves an element of judgment or choice.  Olson, 539 N.W.2d 663, 666 (citing Berkovitz, 486 U.S. 531, 536)).  Thus, "[t]he first element is not met if a statute, regulation, or policy specifically prescribes a mandatory course of action for an employee to follow, because the employee has no rightful option but to adhere to that directive."  Peterson v. Traill County, 601 N.W.2d 268, 273 (N.D. 1999).  "[T]he directive must [also] be specific and mandatory as opposed to a general statutory duty."  Olson, 539 N.W.2d 663, 667 (citing Kennewick Irrigation District v. United States, 880 F.2d 1018, 1026 (9th Cir. 1989)).

---

[8]Specifically, the statute states that a political subdivision may not be held liable for "[t]he decision to perform or the refusal to exercise or perform a discretionary function or duty, whether or not such discretion is abused and whether or not the statute, charter, ordinance, order, resolution, regulation, or resolve under which the discretionary function or duty is performed is valid or invalid."  N.D. Cent. Code § 32-12.1-03(3)(d).

Stark County Social Services is charged with the duty of supervising and protecting the welfare of children within its jurisdiction. See N.D. Cent. Code §§ 50-01.2-03 and 50-25.1-06. Specifically, Section 50-25.1-06 of the North Dakota Century Code provides that

> [t]he department shall provide protective services for the abused or neglected child and other children under the same care as may be necessary for their well-being and shall provide other appropriate social services, as the circumstances warrant, to the parents, custodian, or other persons serving in loco parentis with respect to the child or the other children. The department may discharge the duties described in this section through an authorized agent.

In that capacity, Stark County filed a petition for a protective order and custody of the Geraci children. The court ordered Stark County to take custody and control of the children pursuant to Section 27-20-30 of the North Dakota Century Code. The court did not instruct Stark County regarding supervision or visitation. In its discretion, Stark County allowed Heather visitation of the children. The decision was made after consulting with both parents, the guardian ad litem, and others involved in the children's care. See Deposition of Carrie Kovash, p. 14.

The defendant, Christopher Geraci, concedes that Heather Geraci McCray should have been allowed to have contact with the children. Geraci merely contests the manner in which the visitation was carried out. See Plaintiff's Brief in Support of his Response to Motion for Summary Judgment, p. 19. Geraci offers up numerous alternatives that Stark County could have implemented to better safeguard the children. Id. For example, Geraci suggests that a foster family could have been used, or that visitation could have taken place at the Family Connection facility as opposed to the Rape Crisis Center. In making such an argument, Geraci highlights the discretionary nature of Stark County's decision. It is true that any of the alternatives suggested by Geraci *could* have been implemented. However, none of the alternatives were implemented, nor were they required to be; therein lies the discretion. Outside of the general statutory provisions outlined above, there is simply

no mandate regarding visitation.  Thus, the first element of the discretionary function exception is satisfied.

Having found that the conduct in question involves an element of choice, the second element is "whether that judgment or choice is of the kind that the discretionary function exception was designed to shield."  Olson v. City of Garrison, 539 N.W.2d 663, 667 (N.D. 1995).  "The primary focus of the second part of the test is on the nature of the actions taken and on whether they are susceptible to policy analysis."  Peterson v. Traill County, 601 N.W.2d 268, 273 (N.D. 1999).  As stated by the North Dakota Supreme Court,

> The purpose of the exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  Berkovitz v. United States, 486 U.S. 531, 536-37 (1988).  When properly construed, the exception should shield only governmental action based on public policy considerations.  United States v. Gaubert, 499 U.S. 315, 323 (1991).  Moreover, public policy considerations, social, economic, or political, must be distinguished from more objective standards based on, for example, scientific, engineering, or technical considerations.  Kennewick Irrigation District v. United States, 880 F.2d 1018, 1030 (9th Cir. 1989).  The latter are not protected by the discretionary function exception, id., when the challenged conduct involves nothing more than a "follow the numbers" approach.  David S. Fishback & Gail Killefer, The Discretionary Function Exception To the Federal Tort Claims Act: Dalehite To Varig To Berkovitz, 25 Idaho L. Rev. 291, 294 (1988-89).

Olson v. City of Garrison, 539 N.W.2d 663, 667-68 (N.D. 1995).  Ultimately, to garner immunity under the statute, Stark County's decision regarding supervision and the terms thereof, must implicate some social, economic, or political policy.  See Kautzman v. McDonald, 621 N.W.2d 871, 879 (N.D. 2001); Peterson v. Traill County, 601 N.W.2d 268, 273-74 (N.D. 1999).

Stark County contends that its decision regarding the children's supervision and visitation were made based upon public policy considerations, and thus satisfies the second element of the discretionary function exception.  Stark County points to North Dakota law which, in other contexts,

favors visitation by both parents.  See N.D. Cent. Code § 14-05-22(2).  Stark County reiterates that its decision was reached after consulting with both parents, and a guardian ad litem.  Thus, according to Stark County, its decision concerning supervision and visitation "was inherently bound up in considerations of social and public policy."  See Defendant Stark County's Brief in Support of Motion for Summary Judgment, p. 15.  Alternatively, Geraci colors Stark County's decision as a "follow the numbers" approach, ill-suited to the discretionary function exception.  See Plaintiff's Brief in Support of his Response to Motion for Summary Judgment, p. 18.

The North Dakota Supreme Court has not often analyzed conduct under the second element of the discretionary function exception.  A review of three of the most recent cases best illustrates what type of conduct, according to the North Dakota Supreme Court, the discretionary function was intended to shield.  See Knutson v. City of Fargo, __ N.W.2d __, 2006 WL 1280930 (N.D. May 11, 2006); Kautzman v. McDonald, 621 N.W.2d 871 (N.D. 2001); Peterson v. Traill County, 601 N.W.2d 268 (N.D. 1999).

In Peterson, the North Dakota Supreme Court examined the liability of Traill County for the alleged negligence of jailers at the Traill County jail in Hillsboro, North Dakota.  Peterson v. Traill County, 601 N.W.2d 268 (N.D. 1999).  The incident arose out of the arrest and detention of Leroy Peterson, for non-payment of child support.  After his arrest, Peterson was placed in the Traill County jail on a Friday evening.  Over the weekend, Peterson claimed to have suffered from alcohol withdrawal manifested in the form of vomiting, shaking, delusional episodes, and a lack of appetite.  Id. at 270-71.  No medical attention was given to Peterson over the weekend.  On Monday morning, the jailers contacted a nearby clinic.  Id. at 271.  However, before a doctor could arrive, Peterson fell in his jail cell and suffered a serious head injury.  Peterson filed a negligence action against the

Traill County Sheriff and Traill County for "failing to properly monitor him when he was suffering from alcohol withdrawal, failing to immediately arrange for his medical care, failing to consult with a health care professional before making a decision to delay medical care, failing to appoint a health care administrator for the jail, and failing to properly train county jailers." Id. The trial court dismissed the action finding that the jailers were performing a discretionary function for which Traill County was entitled to immunity.

On appeal, the North Dakota Supreme Court reversed. Peterson, 601 N.W.2d 268, 771-72. The Court examined the jailers' decision under the two elements of the discretionary function exception. As to the first, the Court agreed that the jailers' decision not to provide immediate medical attention involved an element of judgment or choice. Id. at 273. However, as to the second element, the Court explained that such a judgment or choice was not a discretionary function provided protection. As the Court explained, "[n]o social, economic, or political policy is implicated in deciding whether an inmate has alcohol withdrawal and whether transfer to a medical facility is necessary. Rather, this is an ordinary individualized judgment made by jailers as part of their routine work duties." Id.

The North Dakota Supreme Court ruled similarly in Kautzman v. McDonald, 621 N.W.2d 871 (N.D. 2001). In Kautzman, law enforcement officers had responded to several phone calls regarding wandering dogs in the Fargo city limits. Id. at 876-77. Upon arrival, the officers concluded that the dogs posed a safety risk to the people in the area and the officers shot and killed all five dogs. Id. at 877. The dogs' owners, the Kautzmans, filed an action against the officers, the State, and Cass County. Id. at 873. The trial court granted summary judgment in favor of the Defendants as to the negligence claim.

12

On appeal, the North Dakota Supreme Court reversed.  Kautzman, 621 N.W.2d 871, 879. The Defendants argued that they were entitled to immunity under the discretionary function exception.  Citing Peterson, the Court rejected their immunity defense, explaining as follows:

> The decision whether the Kautzmans' dogs posed a danger to the deputies or to others, thereby justifying the dogs' destruction, implicates no social, economic or political policy, and was merely an ordinary individualized judgment made by the deputies as part of their routine work duties.  Discretionary function immunity does not shield individualized decisions such as these.  See e.g., Fowler v. Town of Ticonderoga, 131 A.D.2d 919, 516 (1987); Annot.; Personal liability of public officer for killing or injuring animal while carrying out statutory duties with respect to it, 2 A.L.R.3d 822, at § 3[d] (1965).

Id.  The Court concluded that the discretionary function exception did not apply.

In Knutson v. City of Fargo, __ N.W.2d __, 2006 WL 1280930 (N.D. May 11, 2006), the North Dakota Supreme Court recently examined the discretionary function exception as applied to the City of Fargo.  The Knutsons filed an action against the City of Fargo after a water main under their home broke causing damage to their property.  Id. at *1.  The Knutsons raised several claims, including negligence.  The trial court granted summary judgment in favor of the City, finding that the Knutsons' negligence claim was barred by the discretionary function exception.  Id. at *5.

On appeal, the North Dakota Supreme Court upheld the trial court decision.  Knutson v. City of Fargo, __ N.W.2d __, 2006 WL 1280930, *5 (N.D. May 11, 2006).  The Court relied upon its prior decision of Olson v. City of Garrison, 539 N.W.2d 663 (N.D. 1995), wherein the Court held that the discretionary function exception barred a nearly identical claim against the City of Garrison. The Court explained as follows:

> The City is charged with operating and maintaining its water mains.  As part of the water main maintenance plan, the City has developed a policy to help decide when it should replace a water main.  Regarding day-to-day maintenance, the City presented undisputed evidence that no normal procedure can prevent water main breaks and leaks.  Factors the City considers when deciding what mains to replace

include breaks per city block, recent break history, age of the water main, and the type of main. Economic resources are also evaluated in the decision. The City's maintenance program balances economic and social costs and benefits such as cost of replacement, street conditions, the public's disruption, and the public's cost to find the most appropriate time to replace mains. Therefore, the City exercises its judgment when deciding what mains to replace. As in Olson, this operation and maintenance is the kind of discretionary function that discretionary immunity is designed to shield from second-guessing. Discretionary immunity bars the Knutsons' negligence claim, so summary judgment is appropriate.

Id. at * 6.

Having carefully reviewed the relevant case law, the Court finds that Geraci's claims against Stark County for negligent infliction of emotional distress and intentional infliction of emotional distress are barred by the discretionary function exception. The decisions made by Stark County officials relative to the children's supervision and visitation implicate social, economic, and public policy considerations. The Court finds that the decisions made by Stark County regarding the childrens' supervision and visitation are the type of decisions contemplated under the discretionary function exception and that such decisions should be afforded protection and shielded from judicial second-guessing. As a result, the Court finds that discretionary immunity bars Geraci's negligence claims against Stark County.

### C.   NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In the seminal case of Muchow v. Lindblad, 435 N.W.2d 918, 921-923 (N.D. 1989), the North Dakota Supreme Court recognized the claim of negligent infliction of emotional distress. It is well-established that "[a] plaintiff claiming negligent infliction of emotional distress must show 'bodily harm.'" Hougum v. Valley Memorial Homes, N.W.2d 812, 819 (N.D. 1998) (citing

<u>Muchow</u>, 425 N.W.2d 918, 921)).  In <u>Muchow</u>, the North Dakota Supreme Court further explained

this requirement as follows:

> The bodily harm essential to sustain a claim for relief for negligent infliction of
> emotional distress is defined in Restatement 2d Torts § 15 (1965) as "any physical
> impairment of the condition of another's body, or physical pain or illness."  Bodily
> harm may be caused not only by impact or trauma, but also by emotional stress.
> <u>Payton v. Abbott Labs</u>, <u>supra</u>; Restatement 2d Torts § 436(2) (1965).  Comment c. of
> the Restatement 2d Torts § 436A (1965) further explains the nature of the requisite
> "bodily harm":
>
> "The rule stated in this Section applies to all forms of emotional disturbance,
> including temporary fright, nervous shock, nausea, grief, rage, and humiliation.  The
> fact that these are accompanied by transitory, non-recurring physical phenomena,
> harmless in themselves, such as dizziness, vomiting, and the like, does not make the
> actor liable where such phenomena are in themselves inconsequential and do not
> amount to any substantial bodily harm.  On the other hand, long continued nausea
> or headaches may amount to physical illness, which is bodily harm; and even long
> continued mental disturbance, as for example in the case of repeated hysterical
> attacks, or mental aberration, may be classified by the courts as illness,
> notwithstanding their mental character.  This becomes a medical or psychiatric
> problem, rather than one of law."

<u>Muchow</u>, 435 N.W.2d 918, 921.[9]  In sum, "transitory, non-recurring physical phenomena do not

constitute bodily harm, but long and continued physical phenomena may constitute physical illness

and bodily harm."  <u>Hartman v. Estate of Miller</u>, 656 N.W.2d 676, 685 (N.D. 2003) (citing <u>Muchow</u>,

435 N.W.2d 918, 921)).

By way of example, the plaintiff in <u>Muchow</u> suffered "severe emotional anxiety and

concomitant physical impact, including loss of sleep and loss of weight."  <u>Muchow v. Lindblad</u>, 435

N.W.2d 918, 921-922 (N.D. 1989).  The trial court granted summary judgment in favor of the

defendant finding, as a matter of law, that such complaints did not rise to the level of bodily harm.

---

[9]In <u>Muchow</u>, the North Dakota Supreme Court also explained that a minority of courts have dispensed with
the bodily harm requirement and instead adopted a requirement of "serious" or "severe" emotional distress.
<u>Muchow v. Lindblad</u>, 435 N.W.2d 918, 923 (N.D. 1989) (citations omitted).  The North Dakota Supreme Court did
not follow the minority view in <u>Muchow</u>, and has never endorsed such an approach.

Id. at 920.  The North Dakota Supreme Court agreed.   In doing so, the Court held that there was no evidence presented by the plaintiff to raise a reasonable inference that the loss of weight and sleep were anything more than transitory physical phenomenon.   Id. at 922; see Hougum v. Valley Memorial Homes, N.W.2d 812, 819 (N.D. 1998) ("Hougum has cited no evidence to show his alleged shock, embarrassment, and depression was anything more than transitory phenomenon.").

In the present case, Christopher Geraci alleges that he suffered "severe emotional pain and suffering" as a result of the incident.  See Amended Complaint, ¶ 5.  Geraci has never sought psychiatric or psychological treatment.  See Deposition of Christopher Geraci, p. 68.  He has never entered counseling.  Id. at 67.  No medical professional has offered an opinion regarding emotional injuries sustained on behalf of Geraci.  Id. at 68.  Geraci did speak with a priest on a couple occasions for "[t]en, 15 minutes."  Id. at 155.   In his responsive pleadings, Geraci essentially concedes that he has suffered no bodily harm.  See Plaintiff's Brief in Support of his Response to Motion for Summary Judgment, p. 18.  Instead, Geraci suggests that the bodily harm requirement violates the Equal Protection Clause of the Constitution yet cites no legal support for this contention.

In an attempt to fend off summary judgment, Geraci filed a supplemental affidavit on January 26, 2006.  See Affidavit of Christopher Geraci, Docket No. 55.  The affidavit lists the following emotional and physical illness sustained as a result of the incident:

1)    I was in a state of constant grief.
2)    I returned home to New York State and slowly became increasingly withdrawn from family and friends.
3)    I was constantly drained of energy.  Getting out of bed in the morning was a struggle – as though a tremendous weight was holding me down.  I would have to physically struggle to lift myself from the bed.
4)    There was a constant pain in the middle of my stomach and I can only describe as feeling like what I imagine it would be like to be impaled on a piece of rebar with my feet dangling at least 6 inches off the ground.

16

5)  I experienced headaches and nausea every day which approximately every other day was so severe as to cause vomiting and/or dry heaves.

6)  I lost approximately 20 pounds due to a resultant lack on [sic] in food.

7)  Approximately once every two weeks I would experience an uncontrollable fit of crying accompanied by hyperventilation and chest pain.

8)  Holidays were extremely difficult for me as were [the children's] birthdays and Father's Day.  There was no celebration for me and even though I was invited to the houses of friends and family members – I could not bear to celebrate without the two most important people in my life, my children.

10) I suffered from insomnia: I frequently could not fall asleep at night due to my restlessness  I could not stop thinking about [the children].  I was at my wit's end.

11) The entirety of the year and a half ordeal was a roller coaster ride of emotions filled with depression, sickness, heartache, and pity.  I was unable to look at a parent with their child and not feel envious of their situation.

12) Even now that we are reunited, I am still tormented as I frequently think about the days and milestones I missed.  As I try to parent my girls, I am often at a loss as I do not know why they get frustrated or give me an attitude and I am left to wonder whether these moments are a product of the events I am unaware of during the time that we lost with one another.  I remain tormented by the constant suffering I endured due to the unprofessional, unorganized and gender-discriminatory acts of Stark County Social Services and the Domestic Violence and Rape Crisis Center.  I frequently think about that.  Due to the agencies, I have lost out on extremely important times in my children's lives.

See Affidavit of Christopher Geraci, Docket No. 55.  Again, Geraci admittedly has no medical evidence to support these subjective complaints.

Viewing the evidence in a light most favorable to Geraci, the Court finds that he has failed to raise a reasonable inference that his subjective complaints of harm are anything more than transitory in nature.  A majority of the complaints are purely emotional in nature.  The physical complaints include loss of sleep, loss of weight, headaches, nausea, vomiting, dry heaves, hyperventilation, chest pains, and stomach pains.  See Affidavit of Christopher Geraci.  These symptoms are said to have occurred over a period of 18 months.  Geraci's last-minute affidavit established emotional and physical harm that is transitory in nature.  Geraci's recent affidavit is in

17

stark contrast to his deposition testimony where he offered up no physical or emotional harm in the face of questioning.  Until recently, Geraci all but conceded that he lacked the requisite bodily harm by arguing that such a requirement was unconstitutional.  See Dotson v. Delta Consol. Industries, Inc., 251 F.3d 780, 781 (8th Cir. 2001) (citing American Airlines, Inc., v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108, 111 (8th Cir. 1997); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361 (8th Cir. 1983)) (explaining that a party may not overcome summary judgment by submitting an affidavit contradicting his own sworn deposition testimony).

Due to the lack of medical evidence, the transitory nature of the harm alleged, the inconsistency of the last-minute affidavit, and the timeliness of the affidavit, the Court finds that Geraci has failed to raise a genuine issue of material fact that he suffered the requisite bodily harm necessary to support a claim of negligent infliction of emotional distress.  The Court will decline the invitation to strike down well-established North Dakota law by declaring such a requirement unconstitutional.[10]

---

[10]It should also be noted that Geraci's claim of negligent infliction of emotional distress may also be fatally flawed with respect to the basic elements of a negligence claim.  In North Dakota, "[t]o succeed in a negligence claim, the plaintiff must prove that the defendant owed a duty to the plaintiff, the defendant breached that duty, and the plaintiff suffered an injury that was proximately caused by the defendant's negligence."  Beckler v. Bismarck Public School Dist., 711 N.W.2d 172, 175 (N.D. 2006) (citing Fast v. North Dakota, 680 N.W.2d 265, 268 (N.D. 2004)). Case law suggests that a claim of negligent infliction of emotional distress, like all other negligence claims, requires proof there is a duty owed to the plaintiff.  "If no duty exists on the part of the defendant, there is no negligence."  Hurt v. Freeland, 589 N.W.2d 551, 555 (N.D. 1999).  Although negligence actions are ordinarily not appropriate for summary judgment, whether a duty exists is generally a preliminary questions of law for the court to decide. Id. (citing Crowston v. Goodyear Tire & Rubber Co., 521 N.W.2d 401, 406 (N.D. 1994); DeLair v. County of LaMoure, 326 N.W.2d 55, 58 (N.D. 1982)).

The Defendants make a strong argument that neither the Rape Crisis Center nor Stark County owed any legal duty to Geraci under the facts of this case.  The Court is unaware of any federal decision or decisions from the North Dakota Supreme Court which have held that a domestic violence shelter owes a duty to an ex-husband to prevent his ex-wife from leaving the shelter with their children.  As a general rule, a defendant has no duty to control the conduct of a person to protect him or her from causing harm to others.  See Restatement (Second) of Torts, § 315.  Although an argument can be made that a special relationship existed between the Defendants and the two children while in their custody, it is unlikely that such a duty would extend to Geraci himself.  However, having decided that Geraci has failed to raise a genuine issue of material fact that he suffered bodily harm, the Court need not reach the merits of this argument.

### D.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Muchow v. Lindblad, 435 N.W.2d 918, 923-25 (N.D. 1989), the North Dakota Supreme Court also recognized the tort of intentional infliction of emotional distress.  To prevail on such a claim, the plaintiff must present proof of: "(1) extreme and outrageous conduct that is (2) intentional or reckless and causes (3) severe emotional distress."  Muchow, 435 N.W.2d 918, 924 (citing Restatement (Second) of Torts § 46 (1965)).  The threshold element of extreme and outrageous conduct is narrowly limited to outrageous conduct that exceeds all possible bounds of decency.  Dahlberg v. Lutheran Social Services of North Dakota, 625 N.W.2d 241, 248 (N.D. 2001) (citing Kautzman v. McDonald, 621 N.W.2d 871 (N.D. 2001)).  Quoting from the Restatement (Second) of Torts, the North Dakota Supreme Court wrote as follows:

> "The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

> "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt."

Muchow, 435 N.W.2d 918, 924.

The trial court is charged with the initial task of determining whether the defendant's conduct may be regarded as extreme and outrageous.  Dahlberg v. Lutheran Social Services of North Dakota, 625 N.W.2d 241, 249 (N.D. 2001) (citing Security Nat'l Bank v. Wald, 536 N.W.2d 924, 927 (N.D. 1995)).  If reasonable persons could differ as to that determination, a plaintiff is entitled to have a jury decide whether the conduct is extreme and outrageous so as to result in liability.  Id.

Geraci lists numerous facts which he contends demonstrate "extreme and outrageous" conduct on behalf the Rape Crisis Center and Stark County, including the following: (1) the Rape Crisis Center was not used for visitation prior to this case; (2) the Rape Crises Center was not equipped and the staff was not trained for visitation; (3) Family Connection was better suited as a venue for visitation; (4) the visitation plan was oral, not written; (4) the visitation hours with Heather were too long; and (5) the visitation plan was not well communicated to staff.  See Plaintiff's Brief in Support of his Response to Motion to Dismiss First and Second Causes of Action, pp. 2-8.  The Defendants allege that these facts do not meet the extreme and outrageous threshold.

Viewing the evidence in a light most favorable to Geraci, the Court finds that he has failed to raise a reasonable inference that the conduct of the Rape Crisis Center and Stark County was extreme and outrageous.  Geraci does not allege conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."  Vadall v. Trinity Hospitals, 676 N.W.2d 88, 97 (N.D. 2004).  No reasonable person would describe the failure to memorialize the visitation plan in writing as "atrocious and utterly intolerable in a civilized community."  The same could be said for the other allegations of misconduct cited by Geraci.  The Court finds that Geraci has failed to raise

20

a genuine issue of material fact that the Rape Crisis Center and Stark County's conduct in creating and carrying out a visitation plan for the two children was extreme and outrageous.

### E.   RACKETEERING INFLUENCE AND CORRUPT ORGANIZATIONS ACT

The major purpose behind the Racketeering Influence and Corrupt Organization Act (RICO) was to curb the infiltration of legitimate business organizations by racketeers.  Sinclair v. Hawke, 314 F.3d 934, 943 (8th Cir. 2003) (quoting Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 990 (8th Cir. 1989)); see Burr v. Kulas, 564 N.W.2d 631, 635-36 (N.D. 1997) (explaining the history behind North Dakota's RICO statute).  The federal RICO statute provides civil remedies to any person injured in his business or property by violations of 18 U.S.C. § 1962.  See Sedima v. Imrex, Co., Inc., 473 U.S. 479, 495 (1985) (citing 18 U.S.C. § 1964(c)).

North Dakota's RICO statute, codified at Section 12.1-06.01 of the North Dakota Century Code, provides civil remedies to any person who sustains an injury to his person, business, or property by violations of Section 12.1-06.1-02.  N.D. Cent. Code 12.1-06.1-05(1).  "To establish a RICO violation, a plaintiff must allege and prove '(1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's participation in predicate acts of racketeering; and (4) defendant's actions constitute a pattern of racketeering activity.'"  Sinclair v. Hawke, 314 F.3d 934, 943 (8th Cir. 2003) (quoting United HealthCare Corp. v. Amer. Trade Ins. Co., 88 F.3d 563, 570 (8th Cir. 1996)); see Rolin Manufacturing, Inc., 544 N.W.2d 132, 138 (N.D. 1996) (explaining that for a state RICO action the North Dakota Supreme Court requires a plaintiff to prove the existence of an enterprise, that there is a pattern of racketeering activity consisting of at lease two predicate criminal acts, and there exists either a prior conviction for those alleged criminal acts, or

probable cause to believe such criminal acts were committed).  The Defendants challenge Geraci's federal and state RICO claims for lack of standing, and failure to plead and meet each of the essential elements.

### 1.    STANDING

In a federal RICO action, "the plaintiff only has standing if, and can recover damages to the extent that, he has been injured in his business or property by the conduct constituting the violation." Sedima v. Imrex, Co., Inc., 473 U.S. 479, 496 (1985).  "Thus, the two requirements for RICO standing are (1) an injury to 'business or property' (2) caused 'by reason of' a RICO violation." Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc., 187 F.3d 941, 951 (8th Cir. 1999).  The Defendants challenge Geraci's ability to show injury to "business" or "property."

The express language of a federal RICO action requires the plaintiff to demonstrate injury to his "business" or "property."  18 U.S.C. § 1964(c).  In the federal system, the words "business and property have been termed words of limitation.  See Doe v. Roe, 958 F.2d 763, 767 (7th Cir. 1992).  Courts have held that a plaintiff may not maintain a RICO action based solely upon personal and/or emotional damages.  See id; Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (dictum); Diaz v. Gates, 380 F.3d 480, 483 (9th Cir. 2004); Pilkington v. United Airlines, 112 F.3d 1532, 1536 (11th Cir. 1997); Bast v. Cohen, Dunn, & Sinclair, PC, 53 F.3d 492, 495 (4th Cir. 1995); Genty v. Resolution Trust Corp., 937 F.2d 899, 918 (3d. Cir. 1991); Drake v. B.F. Goodrich Co., 782 F.2d 638, 644 (6th Cir. 1986).  The federal RICO statute does not contain a definition for "business" or "property."

North Dakota's RICO statute deviates slightly in this regard.  North Dakota's statute allows a plaintiff to demonstrate injury to business, property, or *person*.  <u>See</u> N.D. Cent. Code § 12.1-06.1-05(1) (emphasis added).  The statute provides no definition for injuries to "person ," nor has the North Dakota Supreme Court had occasion to address the issue.

In his complaint, Geraci seeks the following as damages:

1.   For damages in excess of $75,000 by reason for the emotional pain and suffering that has been inflicted upon the plaintiff.
2.   For damages for out-of-pocket expenses plaintiff has incurred because of defendants' actions for travel, lodging, telephone calls, food, attorney fees, and other expenses as will be proved at trial.
3.   For such other and further relief as the Court may deem equitable and just.

<u>See</u> Amended Complaint, ¶ 8.  Based on these stated damages, the Defendants seek dismissal of Geraci's RICO claim for lack of standing.  As the foregoing case law demonstrates, personal and/or emotional damages do not satisfy the business and property language of 18 U.S.C. § 1964(c).  Geraci opposes dismissal citing North Dakota's inclusion of the word "person."  Further, Geraci contends that "out-of-pocket expenses" fall within the definition of injury to business or property under the federal statute.

Although not cited by Geraci, several courts have concluded that out-of-pocket expenses are sufficient for a showing of damage to business or property.  <u>See</u> <u>Maio v. Aetna, Inc.</u>, 221 F.3d 472, 483 (3d Cir. 2000) ("the injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss."); <u>Steele v. Hospital Corp. of America</u>, 36 F.3d 69, 70 (9th Cir. 1994) (finding that the plaintiffs could not show injury under RICO where they themselves had not paid any of allegedly excessive charges out of their own pocket); <u>Dornberger v. Metropolitan Life Ins. Co.</u>, 961 F.Supp. 506, 521 (S.D. N.Y 1997) ("Under § 1964(c), a plaintiff must be 'injured in his business or property' in order to recover.  This requires

a showing of some actual, out-of-pocket financial loss.").  In sum, a plaintiff has standing under

RICO, if he shows "out-of-pocket expenditures as a direct or indirect result of racketeering activity."

Oscar v. University Students Co-op. Ass'n, 956 F.2d 783, 786 (9th Cir. 1992).  The Eighth Circuit

has yet to squarely address the issue of out-of-pocket expenses.

Despite the lack of Eighth Circuit precedent, the Court finds the aforementioned case law

persuasive.  Geraci has alleged out-of-pocket expenses incurred as a direct result of this ordeal in

the form of travel, lodging, telephone calls, food, attorneys fees.  See Amended Complaint, ¶ 8.  The

out-of-pocket expenses alleged by Geraci are arguably considered injury to business or property by

the weight of authority.  Thus, Geraci has satisfied the first standing requirement under the federal

RICO statute.  It stands to reason that such damages would also satisfy the seemingly broader North

Dakota statute, which also permits injury to "person."

## 2.    ESSENTIAL ELEMENTS

As previously mentioned, "[t]o establish a RICO violation, a plaintiff must allege and prove

'(1) the existence of an enterprise; (2) defendant's association with the enterprise; (3) defendant's

participation in predicate acts of racketeering; and that (4) defendant's actions constitute a pattern

of racketeering activity.'"  Sinclair v. Hawke, 314 F.3d 934, 943 (8th Cir. 2003) (quoting United

HealthCare Corp. v. Amer. Trade Ins. Co., 88 F.3d 563, 570 (8th Cir. 1996)).  The North Dakota

Supreme Court, in interpreting the state RICO statute, has announced the essential elements which

mimic those of the federal statute.  See Rolin Manufacturing, Inc., 544 N.W.2d 132, 138 (N.D.

1996).  The Defendants challenge each of the essential elements, but primarily focus on Geraci's

perceived inability to show a pattern of racketeering activity consisting of at least two predicate criminal acts.

By statutory definition, a "pattern of racketeering activity" requires at least two predicate acts of racketeering activity.  See 18 U.S.C. § 1961(5); N.D. Cent. Code § 12.1-06.1-01(2)(e).  What constitutes "racketeering activity" is spelled out by statute.  See 18 U.S.C. § 1961(1); N.D. Cent. Code § 12.1-06.1-01(2)(f).  The definition under each statute is simply a list of criminal acts which will constitute "predicate acts" for purposes of RICO.  The plaintiff must show that two or more predicate criminal acts have occurred.  Merely characterizing some event as criminal does not make it so.  See Rolin Manufacturing, Inc., v. Mosbrucker, 544 N.W.2d 132, 138 (N.D. 1996); Wisdom v. First Midwest Bank, of Poplar Bluff, 167 F.3d 402, (8th Cir. 1999) (citing United HealthCare Corp. v. American Trade Ins. Co., Ltd., 88 F.3d 563, 571 (8th Cir. 1996)) ("[A] mere allegation of two or more acts is insufficient to state a RICO claim . . . .").  The plaintiff is required to show either a prior conviction, or probable cause to establish each predicate act alleged.  Mosbrucker, 544 N.W.2d 132, 138.

> To satisfy the "pattern of racketeering" requirement, Geraci's complaint states as follows:
>
> For his third cause of action plaintiff re-alleges all of the allegations set forth above and in addition alleges defendants' actions as so stated were in violation of both state and federal "RICO" statutes in that the conduct of the defendants constituted more than one act of criminal activity, including conspiracy to commit kidnapping, contempt of court orders, use of interstate communications facilities to engage in criminal activity, and others.

See Amended Complaint, ¶ 8.

Relying on the complaint, both Defendants seek dismissal of Geraci's RICO claim correctly recognizing that "contempt of court orders" and "use of interstate communications facilities to engage in criminal activity" are not included in the definition of "racketeering activity" of either the

federal or state RICO statutes.  See 18 U.S.C. § 1961(1); N.D. Cent. Code § 12.1-06.1-01(2)(f).
Neither act can constitute a predicate act for purposes of establishing a pattern of racketeering
evidence.  Thus, Geraci is left with only a single alleged predicate act.  See Amended Complaint,
¶ 8.

In response, Geraci points to his inclusion of the word "others" in his complaint.  See
Amended Complaint, ¶ 8.  Geraci alleged that the Defendants committed "criminal activity,
including conspiracy to commit kidnapping, contempt of court orders, use of interstate
communications facilities to engage in criminal activity, and others."  Id.  Having done so, Geraci's
response alleges entirely new predicate acts, namely conspiracy to reproduce naturalization or
citizenship papers, hindering law enforcement, and criminal facilitation.  See 18 U.S.C. § 1426, N.D.
Cent. Code § 12.1-08-03, and 12.1-06-02.  Geraci seeks leave of court to amend his complaint to
include these new acts.  See Docket No. 42.

On March 8, 2004, the revised scheduling/discovery plan included a deadline of September
1, 2004, for the parties to amend pleadings or add additional claims.  See Docket No. 12.  On March
11, 2004, Geraci did so by filing an amended complaint.  See Docket No. 18.  By way of his motion,
filed on January 3, 2006, Geraci seeks to further amend his complaint to include the new predicate
acts.  In light of the fact that Geraci's request is over one year late, and trial is currently scheduled
to commence in less than two months, the Court is not inclined to grant leave to amend the
complaint.

Even considering Geraci's new allegations, his claims would still fail as a matter of law.
Geraci's claim may mathematically comply with RICO– he has alleged at least two predicate
criminal acts– but he has failed to show, by way of a conviction or probable cause, that the acts

occurred.  Geraci is contending that the Defendants committed conspiracy to commit kidnapping,

conspiracy to reproduce naturalization or citizenship papers,[11] hindering law enforcement,[12] and

---

[11]The crime of reproduction of naturalization or citizenship papers is codified at Title 18, Section 1426 of the United States Code, and reads as follows:

(a) Whoever falsely makes, forges, alters or counterfeits any oath, notice, affidavit, certificate of arrival, declaration of intention, certificate or documentary evidence of naturalization or citizenship or any order, record, signature, paper or proceeding or any copy thereof, required or authorized by any law relating to naturalization or citizenship or registry of aliens; or

(b) Whoever utters, sells, disposes of or uses as true or genuine, any false, forged, altered, antedated or counterfeited oath, notice, affidavit, certificate of arrival, declaration of intention to become a citizen, certificate or documentary evidence of naturalization or citizenship, or any order, record, signature or other instrument, paper or proceeding required or authorized by any law relating to naturalization or citizenship or registry of aliens, or any copy thereof, knowing the same to be false, forged, altered, antedated or counterfeited; or

(c) Whoever, with intent unlawfully to use the same, possesses any false, forged, altered, antedated or counterfeited certificate of arrival, declaration of intention to become a citizen, certificate or documentary evidence of naturalization or citizenship purporting to have been issued under any law of the United States, or copy thereof, knowing the same to be false, forged, altered, antedated or counterfeited; or

(d) Whoever, without lawful authority, engraves or possesses, sells or brings into the United States any plate in the likeness or similitude of any plate designed, for the printing of a declaration of intention, or certificate or documentary evidence of naturalization or citizenship; or

(e) Whoever, without lawful authority, brings into the United States any document printed therefrom; or

(f) Whoever, without lawful authority, possesses any blank certificate of arrival, blank declaration of intention or blank certificate of naturalization or citizenship provided by the Immigration and Naturalization Service, with intent unlawfully to use the same; or

(g) Whoever, with intent unlawfully to use the same, possesses a distinctive paper adopted by the proper officer or agency of the United States for the printing or engraving of a declaration of intention to become a citizen, or certificate of naturalization or certificate of citizenship; or

(h) Whoever, without lawful authority, prints, photographs, makes or executes any print or impression in the likeness of a certificate of arrival, declaration of intention to become a citizen, or certificate of naturalization or citizenship, or any part thereof--

Shall be fined under this title or imprisoned not more than 25 years (if the offense was committed to facilitate an act of international terrorism (as defined in section 2331 of this title)), 20 years (if the offense was committed to facilitate a drug trafficking crime (as defined in section 929(a) of this title)), 10 years (in the case of the first or second such offense, if the offense was not committed to facilitate such an act of international terrorism or a drug trafficking crime), or 15 years (in the case of any other offense), or both.

18 U.S.C. § 1426.

criminal facilitation.[13]  The latter two crimes, hindering law enforcement and criminal facilitation,

are state crimes and not included in the federal definition of "racketeering activity."  See 18 U.S.C.

---

[12]The crime of hindering law enforcement is codified at Section 12.1-08-03 of the North Dakota Century Code, and reads as follows:

1. A person is guilty of hindering law enforcement if he intentionally interferes with, hinders, delays, or prevents the discovery, apprehension, prosecution, conviction, or punishment of another for an offense by:

a. Harboring or concealing the other;
b. Providing the other with a weapon, money, transportation, disguise, or other means of avoiding discovery or apprehension;
c. Concealing, altering, mutilating, or destroying a document or thing, regardless of its admissibility in evidence;
d. Warning the other of impending discovery or apprehension other than in connection with an effort to bring another into compliance with the law; or
e. Giving false information or a false report to a law enforcement officer knowing such information or report to be false.

2. Hindering law enforcement is a class C felony if the actor:

a. Knows of the conduct of the other and such conduct constitutes a class AA, class A, or class B felony; or
b. Knows that the other has been charged with or convicted of a crime and such crime is a class AA, class A, or class B felony.
Otherwise hindering law enforcement is a class A misdemeanor.

N.D. Cent. Code 12.1-08-03.

[13]The crime of criminal facilitation is codified at Section 12.1-06-02 of the North Dakota Century Code, and reads as follows:

1. A person is guilty of criminal facilitation if he knowingly provides substantial assistance to a person intending to commit a felony and that person, in fact, commits the crime contemplated, or a like or related felony, employing the assistance so provided. The ready lawful availability from others of the goods or services provided by a defendant is a factor to be considered in determining whether or not his assistance was substantial. This section does not apply to a person who is either expressly or by implication made not accountable by the statute defining the felony facilitated or related statutes.

2. Except as otherwise provided, it is no defense to a prosecution under this section that the person whose conduct the defendant facilitated has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense, is immune from prosecution, or is otherwise not subject to justice.

3. Facilitation of a class A felony is a class C felony. Facilitation of a class B or class C felony is a class A misdemeanor.

N.D. Cent. Code § 12.1-06-02.

§ 1961(1).  Therefore, neither crime can qualify as a predicate act for Geraci's federal RICO claim.

See id; Manion v. Freund, 967 F.2d 1183, 1186 (8th Cir. 1992).  However, the crimes may qualify

as predicate acts for Geraci's state RICO claim.  See N.D. Cent. Code § 12.1-06.1-01(f).  Again,

under both the federal and state RICO statutes, Geraci must show at least two qualifying predicate

acts.  It is undisputed that there are no prior convictions for any of these acts.[14]  Thus, Geraci's

burden is to show probable cause that each criminal act occurred.

Geraci's criminal allegations are essentially based upon the idea that the Rape Crisis Center

and Stark County had knowledge of, aided in, and/or acquiesced to Heather's taking of the two

children.  However, every Rape Crisis Center and Stark County employee deposed to date testified

to having no knowledge of Heather's plan.  Heather also testified that she never told anyone of her

intentions.  See Deposition of Heather Geraci McCray, pp. 28-29.  She was only able to remove the

children from the Rape Crisis Center by creating a diversion.   After leaving, Heather never

contacted, or communicated with, any Rape Crisis Center or Stark County employee.  Id.

Geraci's own deposition testimony, and answers to interrogatories, also seem to support the

above-mentioned evidence, or lack thereof.  In his deposition, Geraci admits to having no personal

information to support his criminal allegations contained in the complaint.

> Q. So you have no factual basis to support what you have characterized as your third
> cause of action, a RICO claim?
>
> A. No, there's no facts that I personally have to support that.

See Deposition of Christopher Geraci, p. 57.  Similar responses are found in Geraci's answers to

interrogatories.

---

[14]Heather Geraci pled guilty to the charge of custodial interference in state court.  See Deposition of
Heather Geraci McCray, p. 101.

7.  THIRD CAUSE OF ACTION - RICO
Please identify which employees of the Women's Alliance, Inc., you believe committed acts of "criminal activity, including conspiracy to commit kidnapping, contempt of court orders, use of interstate communications facilities to engage in criminal activity and others" and identify the specific acts of the employees you allege was "criminal activity" and state when those acts were to have occurred.

Answer to number 7:
I don't know.

See Plaintiff's Answers to Interrogatories from Defendant, Women's Alliance Set No. 1, p. 13.

Despite the apparent lack of evidence, Geraci maintains that the alleged criminal acts occurred.  In doing so, Geraci's relies primarily on the testimony of Jacqueline Baker, a former resident at the Rape Crisis Center.  Baker testified that she had discussions with Rape Crisis Center employees about "going underground."  See Deposition of Jacqueline Baker, p. 57.  "Going underground," meant to obtain a new name and Social Security number.  Id. at 184.  In the past, Stark County actually assisted Baker in *legally* securing a new name and Social Security number. Id. at 182.  According to Baker, Rape Crisis Center employees had discussed "going underground" with Heather prior to her departure.  Id. at 187-88.  Baker also contends that employees were aware of the outstanding warrant against Heather, but did nothing.  Id. at 187.

Under RICO, Geraci has the burden of showing that the predicate acts took place.  A conviction will suffice.  However, with no conviction, as is the case here, Geraci must show probable cause.  The Court finds that Geraci has failed to meet that burden.  Essentially, Geraci's evidence comes from a single source, that being Jacqueline Baker.  Baker's testimony is purely hearsay, and  refuted by all Rape Crises Center and Stark County employees, as well as Heather Geraci.  It cannot be said, in light of the overwhelming evidence to the contrary, that there is fair probability that the Rape Crisis Center and Stark County committed any of the predicate criminal

acts.  Simply put, Geraci has failed to show probable cause.  Even if Geraci had properly included the additional three predicate acts in his complaint, the federal and state RICO claims would still fail as a matter of law.

RICO also requires a plaintiff to "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  Lange v. Hocker, 940 F.2d 359, 361 (8th Cir. 1991) (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)).  This continuity requirement can be shown in one of two ways, either "close-ended continuity" or "open-ended continuity."  Id.  Closed-ended continuity can be proven by showing "a series of related predicates extending over a substantial period of time."  Id.  Conversely, open-ended continuity, requires showing a specific threat extending indefinitely into the future.  See Lange, 940 F.2d 359, 361.  Stated differently, continuity "may refer 'either to a close period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'"  United HealthCare Corp. v. American Trade Ins. Co., Ltd., 88 F.3d 563, 579 (8th Cir. 1996) (citations omitted).

Assuming arguendo that Geraci had probable cause for each of the predicate acts, he is unable to show continuity in either form.  The Rape Crisis Center and Stark County's alleged involvement would, at the earliest, begin in February of 2003, when Heather arrived in Dickinson.  Their involvement would end when she left the Rape Crisis Center on July 24, 2003.  The Defendants have cited numerous cases for the proposition that such a length of time is insufficient for a showing of continuity.  See e.g., Primary Care Investors, Seven Inc. v. PHP Healthcare Corp., 986 F.2d 1208, 1215 (8th Cir. 1993); Uni Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 922 (7th Cir. 1992); Aldridge v. Lily-Tulip Inc. Salary Retirement Plan Benefits Committee, 953 F.2d 587, 593

(11th Cir. 1992); <u>Hughes v. Consol-Pennsylvania Coal Co.</u>, 945 F.2d 594, 609-11 (3d Cir. 1991);

<u>American Eagle Credit Corp. v. Gaskins</u>, 920 F.2d 352, 354-55 (6th Cir. 1990).

In light of that case law, Geraci suggests that any wrongdoing on behalf of the Defendants should begin, instead, in August of 2002, when Heather left New York with the children. The wrongdoing would end in January of 2005, when Heather was located in Utah. Using those dates, Geraci contends that the pattern of racketeering lasted for a period of three years and five months, as opposed to the five and a half months outlined by the Defendants.

The inherent flaw in Geraci's calculation is that it is based upon Heather's conduct, and not upon that of the Defendants. By asserting that the pattern of racketeering lasted three years and five months, Geraci assumes that the Defendants are accountable for a non-party's conduct (Heather). However, Geraci has presented no evidence to establish a connection between Heather and the Defendants prior to her arrival in Dickinson, or after her departure. At most, the Defendants should only be accountable for their time associated with Heather, that being five and a half months. As demonstrated by case law, this amount of time does not satisfy the "substantial period of time" requirement. Geraci's claim could only survive if he was able to show that there was a sufficient threat of future repetition. Despite Geraci's claims to that effect, the Court finds no credible evidence to support such a position.[15] The idea that the alleged enterprise between the Rape Crisis Center and Stark County poses a future criminal threat is unsupported by the record. In summary,

---

[15]The Defendants also contend that Geraci's RICO claims should fail due to the non-existence of an actionable enterprise, an essential element of such claims. For the sake of brevity, the Court will not delve into that subject matter. Suffice it to say, the Defendants' arguments in this regard are persuasive, and Geraci's counter-arguments are weak.

the Court finds that Geraci has failed to raise a genuine issue of material fact as to either the federal or state RICO claim.[16]

### III.   CONCLUSION

For the reasons set forth above, the Rape Crisis Center's Motion to Dismiss Third Cause of Action (Docket No. 38), Rape Crisis Center's Motion to Dismiss First and Second Causes of Action (Docket No. 39), and Stark County's Motion for Summary Judgment (Docket No. 40) are **GRANTED**.  Stark County's Objection to Plaintiff's Supplemental Disclosure (Docket No. 54), Stark County's Objection to Geraci's Affidavit (Docket No. 56), and Rape Crisis Center's Objection to Geraci's Affidavit (Docket No. 57) are **DENIED** as moot.

**IT IS SO ORDERED.**

Dated this 29th day of June, 2006.

_/s/ Daniel L. Hovland_____
Daniel L. Hovland, Chief Judge
United States District Court

---

[16]The Court would note that the state RICO claim is also deficient in that there is no evidence in the record to show that any alleged "racketeering" was "committed for financial gain," a critical element that needs to be established.  N.D. Cent. Code § 12.1-06.1–01(2)(f).  Geraci admitted in his deposition that he has no facts which would suggest that any of the Defendants' alleged acts were committed for financial gain.  See Deposition of Christopher Geraci, p. 137.